**MERCK & CO., INC., Petitioner,**

v.

**U.S. INTERNATIONAL TRADE COMMISSION, et al., Respondents.**

**Appeal No. 85–1277.**

United States Court of Appeals, Federal Circuit.

Oct. 9, 1985.

James B. Kobak, Jr., Hughes, Hubbard & Reed, New York City, argued for petitioner. With him on brief were Robert J. Sisk, Theodore V.H. Mayer, William M. Thomas, Jr. and Ruth L. Piekarska.

Robert L. Banse and Mario A. Monaco, Merck & Co., Inc., of Rahway, N.J., of counsel.

Marcia H. Sundeen, Office of the Gen. Counsel, International Trade Com'n, Washington, D.C., argued for respondent ITC. With him on brief were Lyn M. Schlitt, Gen. Counsel and Michael P. Mabile, Asst. Gen. Counsel.

Peter W. Gowdy, Cushman, Darby & Cushman, Washington, D.C., argued for respondent Mylan Pharmaceuticals. With

him on brief were Carl G. Love, James T. Hosner and Kendrew H. Colton.

Andrew G. Fusco, Morgantown, West Va., of counsel.

Irving Wiesen, Bass & Ullman, of New York City, argued, for respondent Par Pharmaceuticals. With him on brief was Steven R. Trost.

Alfred B. Engelberg, Amster, Rothstein & Engelberg, New York City, argued, for respondents Zenith & ACIC.

Seymour B. Jeffries, Woodmere, N.Y., was on brief for respondent Gyma Laboratories of America, Inc.

Robert V. Marrow, Salon, Marrow, Dyckman & Trager, New York City, for respondent Chelsea Labs, Inc., et al.

Jerome H. Tick, Krieger & Tick, New York City, for respondent S.S.T.

Frances B. Bernstein, Pavia & Harcourt, New York City, for respondent Fabbrica Italiana.

Delia Doyle Rose, Haas, Boehm, Brown, Rigdon, Seacrest and Fisher, P.C., Daytona Beach, Fla., for respondent Ellis Pharm. I.

T. Mitchell Willey, Oppenheimer, Wolff, Foster, Shepard & Donnelly, Washington, D.C., for respondent, Industrie Chimiche Farmeuiche Italiane, SPA.

David A. Gantz, Oppenheimer, Wolff, Foster, Shepard & Donnelly, Washington, D.C., of counsel.

Before FRIEDMAN, DAVIS and NIES, Circuit Judges.

FRIEDMAN, Circuit Judge.

This is a petition by Merck & Co., Inc. (Merck), for review of a determination of the United States International Trade Commission (Commission) summarily terminating an investigation under section 337 of the Tariff Act of 1930, 19 U.S.C. § 1337 (1982). The investigation involved the importation into the United States of a product manufactured abroad by a process that allegedly violated Merck's patent covering the process. We reverse the Commission's determination and remand the case to the agency for further proceedings.

I

A. This case involves U.S. Patent No. 3,629,284 ('284 patent), which is directed to a method of producing Indomethacin, a pharmaceutical compound useful in the therapy of inflammatory diseases. The application that matured into the '284 patent, Serial No. 838,037 ('037 application), originally was assigned to Sumitomo Chemical Company, Limited (Sumitomo), a Japanese company. Sumitomo also had four other pending patent applications claiming related subject matter. The examiner agreed to allow the '037 application in view of Sumitomo's expressed intent "to insure the issuance of the patents [resulting from all five applications] on the same day" "so as to avoid any question of extension of monopoly as by double patenting...."

After the Patent and Trademark Office sent a Notice of Allowance of the '037 application to Sumitomo, Sumitomo filed a terminal disclaimer which, in addition to disclaiming the portions of the terms of any of the five patents covering the period subsequent to the earliest expiration date of any of them, also stated:

[I]t is agreed (pursuant to the Commission's notice appearing at 860 O.G. 661–2) that the patent issuing on [this] application ... shall expire immediately if it ceases to be commonly owned with the patents issuing on applications serial nos. 605,171, 695,332, 635,362, and 605,154 [the four other patents].

The '284 patent was issued to Sumitomo on December 21, 1971. The four other patents also were issued to Sumitomo.

In 1967, Merck had obtained from Sumitomo a nonexclusive license under the patent application that preceded the '037 application. Merck has been the sole licensee under the '284 patent.

B. On July 21, 1983, Merck filed a complaint with the Commission seeking to bar the importation of Indomethacin allegedly made according to the method claimed in the '284 patent. The Commission initially

rejected the complaint on the ground that Merck, as a nonexclusive licensee, did not have standing to file the complaint.

On December 27, 1983, Merck entered into an agreement with Sumitomo in which Sumitomo assigned to Merck for $50,000 its "entire right, title, and interest, in and to" the '284 and one other patent (which did not result from any of the four applications referred to in the terminal disclaimer).

On January 17, 1984, Merck filed with the Commission a new complaint, which reiterated the charges in its prior complaint. The complaint also stated that the patents of which Merck had been the licensee, including the '284 patent, had been "assigned by Sumitomo to MERCK" in 1983. In response to this complaint, the Commission initiated an investigation.

On August 30, 1984, Mylan Pharmaceuticals, Inc. (Mylan), one of the respondents in the complaint proceeding, moved for a summary determination terminating the investigation. It argued that the December 27, 1983 assignment covered only the '284 patent and not the other four related patents, and that the '284 patent therefore had expired under the terminal disclaimer.

On September 4, 1984, Sumitomo assigned to Merck, effective December 27, 1983, and without any additional consideration, "the entire right, title and interest, in and to" the four other patents.

On September 11, 1984, the administrative law judge granted Mylan's motion and issued an initial determination terminating the investigation. She found that there were "no genuine issues of material fact in issue for the purposes of [the] motion...." She ruled that under the terminal disclaimer, the '284 patent expired when it was assigned to Merck on December 27, 1983, without the assignment of the four other patents; and that the September 4, 1984 retroactive assignment of the four patents could not revive the expired '284 patent. She accordingly concluded that following the December 27, 1983 assignment, there no longer existed any rights in the '284 patent upon which Merck could base a complaint.

The Commission declined to review the initial determination of the administrative law judge terminating the investigation, which thereby became final.

## II

■ We agree with the administrative law judge that the '284 patent expired on December 27, 1983, unless the four related patents were also transferred to Merck by that assignment. Further, we agree that if the '284 patent expired, it could not be revived or reactivated by later assignments.

A. 1. If only the language of the assignment agreement itself were considered, there is no immediately apparent basis for rejecting the administrative law judge's decision. On its face, the December 27, 1983 assignment covered only the '284 patent and did not explicitly convey any interest in any of the four other patents referred to in the terminal disclaimer. The relevant portion of the December 27 assignment states that Sumitomo

> hereby assigns and transfers to MERCK & CO., INC. ... the entire right, title and interest, in and to the United States Letters Patent Number[ ] 3,629,284 ... and all the rights and privileges under said Letters Patent[ ] and reissues thereof for fifty thousand United States Dollars....
>
> SUMITOMO undertakes that, when required, it will sign all papers and take all rightful oaths for vesting title thereto in MERCK....
>
> SUMITOMO hereby confirms that the rights and property herein conveyed are, to the best of SUMITOMO's knowledge and belief, free and clear of any incumbrance and that SUMITOMO has the full right to convey the same as herein expressed.

There is nothing in this language to indicate that Sumitomo thereby assigned to Merck the four other patents as well. In terms it covers only Sumitomo's "entire right, title and interest in and to the United States Letters Patent Number[ ] 3,629,284 ... and all the rights and privileges under

said Letters Patent[ ]...." Moreover, since the assignment additionally and explicitly conveyed another of Sumitomo's patents which is not involved in this case, it would seem that if the parties had intended the December 27 assignment to cover the four other patents, they would have so stated. Indeed, Merck admitted in its brief before us that it was unaware of the common ownership provision of the terminal disclaimer during its 1983 negotiations with Sumitomo.

Under this analysis, the effect of the December 27 assignment was that the '284 patent "cease[d] to be commonly owned" with the four other patents and the '284 patent "expire[d] immediately." If the '284 patent thus expired, it could not be revived or recreated by a retroactive assignment of the other four patents.

2. The provision in the terminal disclaimer that the '284 patent would "expire immediately" if it ceased to be commonly owned with the other four patents conformed to the requirements of the Patent and Trademark Office that were in effect when the disclaimer was filed. Commissioner's Notice, 848 O.G. 1 (Feb. 14, 1968). *See generally In re Van Ornum,* 686 F.2d 937, 214 USPQ 761 (CCPA 1982). An amendment to 37 C.F.R. § 1.321 (1971), effective April 30, 1971, changed this requirement to provide that disclaimers need state only that the patent be unenforceable during the period it is not commonly owned with the other patents recited in the disclaimer. This amendment was publicly proposed at 35 Fed.Reg. 20,012 (1970) and published at 36 Fed.Reg. 7312 (1971), both before the date on which the '284 patent issued. Sumitomo, however, never attempted to have the language of its disclaimer changed to incorporate this new and less severe standard.

Merck contends that since Sumitomo had received a notice of allowance of the '037 application (which matured into the '284 patent) before and not after Sumitomo filed the terminal disclaimer, Sumitomo could have obtained the patent without such filing. From this it concludes that the terminal disclaimer should not be given effect.

The record is clear, however, that the examiner agreed to allow all of the applications, including the '037 application, only because Sumitomo had indicated that it would file a terminal disclaimer. The common ownership provision of the terminal disclaimer that Sumitomo filed conformed with the Commissioner's then existing requirements. We decline here, as we did in *Kinzenbaw v. Deere & Co.,* 741 F.2d 383, 389, 222 USPQ 929, 933 (Fed.Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1357, 84 L.Ed.2d 379 (1985), to undertake the speculative inquiry whether, if Sumitomo had not filed the terminal disclaimer containing the common ownership provision, the '284 patent would have issued and what its scope would have been.

B. Before both the Commission and this court, Merck argued that the intent of the parties to the December 27, 1983 assignment was to convey to Merck valid ownership of Sumitomo's interest in the '284 patent; that if accomplishing that objective required an assignment of the four other patents as well, the parties necessarily intended the assignment to have that effect; that it thereby acquired equitable ownership of the four other patents; that equitable ownership is sufficient to maintain "common ownership" under the disclaimer; and that the *nunc pro tunc* assignment confirms the parties' original intent and action. Merck opposed Mylan's motion for summary termination of the investigation on the ground that there were disputed issues of material fact relating to the intent of the parties that required a hearing. In other words, Merck sought to prove that the *nunc pro tunc* provision in the formal assignment of the four patents merely implemented the original understanding and intent of the parties when Merck acquired the '284 patent from Sumitomo.

In holding that "[t]here are no genuine issues of material fact in issue for the purposes of this [Mylan's] motion," the administrative law judge held that "[t]he in-

tent of Sumitomo ... is not material.... The Patent Office granted the '284 patent in reliance on the patentee's representation that the patent would expire on a given condition. Merck is estopped from contending that because the occurrence of the condition was unintentional, the patent should not expire."

This conclusion, however, assumes the very fact that Merck disputes and upon which it seeks to introduce evidence, namely, that the December 1983 assignment covered only the '284 patent and not the four others. Merck's position is that the parties to that assignment intended to and did assign the four other patents because only the broader assignment would have transferred the '284 patent in viable and meaningful form.

The record contains facts which, if explored and developed, might lead the Commission to accept Merck's position.

1. The December 1983 assignment was made shortly after the Commission had rejected Merck's initial complaint because, as a nonexclusive licensee, Merck lacked standing to file it. Merck obtained the assignment for the obvious purpose of giving it standing to file its complaint with the Commission. Indeed, it filed its new complaint only 20 days after the assignment. Merck paid Sumitomo $50,000 for the assignment of the '284 (and another) patent. Merck stresses that it would not have paid $50,000 to acquire a patent for use in filing a complaint with the Commission if that patent would not have enabled it to take that action.

We do not know whether Merck told Sumitomo the reason it needed to acquire the patent. If it did, Sumitomo must have been aware that for the '284 patent to accomplish Merck's purpose, Merck had to acquire valid ownership of the patent. If the interest in the patent that Sumitomo sold to Merck ceased to exist upon transfer of the patent, that result would have thwarted the very purpose for which Merck acquired the patent and for which it paid Sumitomo $50,000.

Merck argues that in these circumstances the equities strongly favor it. Merck, however, ignores an important fact that cuts against it. The terminal disclaimer itself, to which the patent referred, was part of the public prosecution file of the patent. If Merck had examined that file before acquiring the patent, it would have seen the common ownership provision and could have insisted that the assignment explicitly and specifically cover the four other patents.

2. Five days after Mylan on August 30, 1984 filed its motion to terminate the investigation, Sumitomo assigned the four other patents to Merck. Sumitomo did so without additional payment and made the assignment retroactive to the December 1983 assignment. This action suggests a recognition by Sumitomo that the original assignment covered the four other patents, *i.e.*, that what the parties intended the December 1983 assignment to accomplish was to give Merck whatever interest it needed to prosecute before the Commission a complaint alleging infringement of the '284 patent.

3. In another agreement executed simultaneously with the December 27 assignment, Merck and Sumitomo agreed that "[t]he ASSIGNMENT AGREEMENT [December 27 assignment] ... shall be governed by and construed in accordance with the laws of Japan."

The parties to the December 1983 assignment agreement apparently intended that all questions concerning the meaning and application of the agreement would be determined under Japanese law. The question whether the assignment agreement necessarily covered the four other patents in addition to the '284 patent would seem to be the kind of question on which Japanese law would govern.

Sumitomo, however, was not a party to the Commission proceedings. The dispute here is not between the parties to the assignment agreement but between one of those parties and a third person. The provision in the supplementary agreement that Japanese law would determine the meaning

and effect of the assignment agreement is the last sentence of a paragraph stating that the "parties" agreed to settle any controversies arising out of the assignment agreement between themselves or, if they could not reach settlement, to settle the controversy through arbitration. The governing law provision which followed may apply only to the resolution of disputes between the parties, and not to the interpretation of the contract for purposes of the present dispute.

If Japanese law should govern, we do not know what that law is. Under United States contract law, the "principal purpose" of the parties to a contract is an important factor in its interpretation. Restatement (Second) of Contracts §§ 200–04 (1979). Similarly, the subjective intent of the parties bears on whether there has been a mistake that may be rectified through avoidance or reformation. *Id.* at §§ 151–58. We do not know whether Japanese law contains similar principles, or whether or to what extent that law permits the terms of a written contract to be explained or varied by parole evidence.

To the extent that Japanese law may be relevant, the Commission will be required to receive evidence or briefs on the question, since in the federal courts foreign law is a question of law to be determined by expert evidence or any other relevant source. Fed.R.Civ.P. 44.1; *see also Bamberger v. Clark,* 390 F.2d 485 (D.C.Cir. 1968). The relevance of Japanese law in interpreting this contract and the determination of what that law is are matters for the Commission to determine in the first instance.

Considering all the circumstances, we conclude that the Commission should not summarily have terminated the investigation. It should have permitted Merck to introduce whatever evidence it has to show the actual intent of the parties to the December 1983 assignment agreement in determining what interest Sumitomo conveyed to Merck under that agreement.

## CONCLUSION

The order of the Commission summarily terminating the investigation is reversed, and the case is remanded to the Commission for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

DAVIS, Circuit Judge, dissenting.

For the reasons set forth in Part II, A, of the court's opinion, I agree that the assignment of December 27, 1983—if read on its own terms and within its own four corners—cannot be read to have assigned to Merck the four related patents, but solely the '284 patent (of the now relevant patents).

Unlike the court, I believe, however, that that is the only way that assignment should be read in this public International Trade Commission proceeding, involving parties other than just Merck and Sumitomo, and concerning the fulfillment of a patent disclaimer. Sumitomo's patent disclaimer was, of course, a public document on file in the Patent and Trademark Office, intended to be read and understood on its face by all those who sought to discern whether the '284 patent was still alive. Similarly, in my view, the assignment of December 27, 1983 should be able to be read (at least by outsiders) solely on its face and without having to delve into any non-revealed understandings entertained by Sumitomo and Merck between themselves. If, for instance, an outsider—aware of the disclaimer and attempting to discover the current status of the ownership of the '284 patent—had actually come across the December 27, 1983 assignment, he should be able to rely solely on its facial meaning, without more. That is not simply a matter of a right of personal estoppel (because, say, of reliance) but is a result of the public purpose and nature of the disclaimer and of its continued implementation and fulfillment—and the consequent right of all outside persons and entities (*i.e.*, all those other than Merck and Sumitomo) to

be able to rely on the face of the involved documents.[1] To my mind, the proper implementation of the system of patent disclaimers calls for that objective and straightforward method of reading documents involved in determining the direct impact of the disclaimer on the life of the patent. I would therefore affirm the Commission.

1. As between Merck and Sumitomo in a matter not directly involving the disclaimers—for instance, in a suit between them as to the ownership of the four related patents—the rule might well be different.